and we'll turn to the third case and final case to be argued on this day calendar 19-4292 USA v. Kourani. Mr. Tomeo. Good afternoon, your honors. May it please the court. In the almost 40 years I have appeared before this court, this is the first time I will present an argument without interruption. I will do the best I can. Congratulations. Thank you, your honor. In this case, my client, Mr. Kourani met with FBI agents who wanted him to cooperate against Hezbollah and made statements which resulted in his sentence to almost 40 years in prison. There was no evidence that anyone was injured as a result of his conduct, that he acquired any or that even any plans of terrorist activities were discussed. Yet he received a sentence several times that imposed on other people committed of similar or even more severe crimes. In the time I have, I would like to address four issues. The treatment of Mr. Kourani's statements by the district court, the jury instructions, the sufficiency of the evidence and the sentence. The FBI agents improperly induced Kourani to make statements which formed the basis for the instant prosecution on their insurance to him and his attorney, Mark Debrow, that the interviews would be kept confidential. They even allowed the attorney's statement that Kourani would not face prosecution to go unchallenged. As a result, Mr. Kourani made statements that led to his convictions. Your Honor, in this case, I think it's important to consider the origin of this interview. This interview was initiated not by the FBI. The government's brief omits the long history of contacts between the FBI and Mr. Kourani in which they attempted to obtain his cooperation. However, the interviews in which he made the statements that formed the basis for the prosecution was based on his contact with the FBI. He had not heard from them since the prior summer, and he met Agent Costello in Lebanon and Agent Shannon when he returned to Newark. On those occasions, the agents told him that if he did not have any contact with the FBI, he would face difficulties. But those difficulties were the nature of his ability to live in the United States and to work in the United States. They never indicated to him that he faced prosecution. In the spring of 2017, he retained an attorney to contact the FBI to pursue the opportunity to provide information to them, which he hoped would help him with certain problems he had at the time. And they, as I said, met with him on the understanding that what he said would be held in confidence. In denying his motion to suppress the statements, Judge Hellerstein recognized that several courts of appeal have held that the government violates a defendant's due process rights when it discloses statements it promised to keep confidential. However, we recognize that Second Circuit has not ruled on this proposition. This court's decision, United States v. Haas, is not to the contrary. In that case, the court held that law enforcement conduct that is false and misleading would not necessarily render a confession involuntary, but that the district court must consider the totality of the circumstances. This is a standard which we believe the district court should have applied and failed to do so. In this case, the agents, as I indicated, were given a statement by the attorney in writing that he understood that Mr. Karani was not facing any prosecution, and they did not say they disagreed with that. In doing so, they engaged in a type of deception that this court should not countenance. The government's attempt to extend Haas into a license for government agents to mislead with impunity should not be countenanced either. Delivered lies in response to suspects' questions concerning the investigation and whether he was a target are probative factors in the issue of whether or not his statements were voluntary. In a related matter, your honors, the lower court denied Mr. Karani's request for jury instructions, which would place this issue as it properly should have been before the jury. Over defense objection, Judge Hellestein not only denied their request, but specifically instructed the jury not once but twice that the statements were not obtained in violation of anyone's rights. The instruction, your honor, placed the trial court's imprimatur on these contested statements. The government incorrectly argues that the lower court's charge was proper because it tracked the wording of 18 U.S.C. 3501A. However, the jury's trial court's instruction that there was no violation of anyone's rights cannot be found in that statute. The jury, under that, should have properly been permitted to make its own determination as to the weight to be given to the statements based upon the circumstances in which they were made. We submit that Judge Hellestein's instruction took this issue away from the jury and gutted the court to instruct the jury to, quote, give such weight to the confession as the jury feels it deserves under the circumstances. When the defense renewed its objection at the end of the jury instructions, the trial judge doubled down and restated the objectionable language that, quote, there was no violation of anyone's rights. Your honor, also in this context, we must consider the sufficiency of the evidence. The evidence in this case was based principally on Mr. Karani's statements. There was virtually no corroboration. In fact, I would say there was no corroboration that should be given any weight. What they were able to do is they were able to show certain travel dates as well as certain searches on his computer and emails. But most of it did not show any criminal activity. They also mentioned and said as corroboration that he had rented a storage facility. But again, that actually itself was not criminal. There was no evidence whatsoever that that storage facility was used to store anything other than the clothes that Mr. Karani sold as part of his business. In fact, he even paid for insurance if he was going to keep contraband in the storage facility. He was not going to make an insurance claim if anyone took it from him. Nothing illegal was found in his apartment, on his laptop, or in his cell phone, or even in the cell phone SIM card that the agent took from his cell when he returned to the United States. There was no evidence that he provided any funds, goods, or anything of substance to Hezbollah. In my final minute, Your Honor, let me address the issue on the sentencing. The sentencing we submit was not procedurally reasonable. The court did not adequately consider the need to avoid sentencing disparities. This court actually made no findings regarding sentencing disparities. In the government's brief, what they cite is their own briefing on this issue, which the judge acknowledged was that it was contradicted by Mr. Karani's attorney's submissions, but he did not make any finding that one or the other was true. As we indicated before, the sentence imposed was substantially greater than that imposed on other similarly situated people. We also submit, Your Honor, that the district judge relied improperly on unsubstantiated findings, which were no more than pure speculation. For instance, Your Honor, the judge said that Mr. Karani had traveled to China in 2009 in connection with activities for Hezbollah. The evidence showed that he did travel to China in 2009, but it was in connection with a trade show in, and I know the old pronunciation of the city of Canton, a city of more than 13 million people. The government attempts to tie that, and the district court tied that trip in 2009 to materials seized in Thailand three years later and in Cyprus six years later, only because the company from which that material was obtained was also in that same city. There was no link, and certainly Jerteliste never articulated any link between that trip and the seizures in those foreign other countries. While the government is correct that the sentencing judge may rely on inferences, those inferences must be reasonable. They must be based on fact, not flights of fiction. Similarly, the court found that Mr. Karani formed front companies for illegal activity. Again, there was no evidence to connect those companies which sold counterfeit clothing to terrorist activities charged in the incident case. The government argues that his admission that the company sold counterfeit companies supported the inferences that he operated businesses to shroud illegal activity. But if he was trying to shroud the activity of supporting terrorism, he wouldn't be engaging in activity that could and did in fact bring him to the attention of law enforcement. There was no support for the allegation that was in the PSR and adopted by the government, I'm sorry, by the court that he had those storage facilities for the purpose of storing weapons. There's no evidence that anyone stored any weapons at those locations, and there was no evidence that Mr. Karani himself ever acquired any weapons in the United States for any purpose. As a result, the inference is unreasonable, and the court erred in overruling Mr. Karani's objections to it. Finally, Your Honor, as I said at the outset, the 40-year sentence which Judge Hellestein imposed is substantively unreasonable because it exceeded those imposed in similar cases, even in cases involving more egregious activities. I think my time has expired. I reserve three minutes for rebuttal. Your Honor, do you have any questions? Thank you very much. Judge Kears, any questions? Yeah, I have one question about the disparity in sentencing contention. Did you call to the convicted of these three categories of crimes? One, providing substantial assistance to terrorists. Two, getting military instruction from a terrorist organization. And three, fraudulently getting United States citizenship. Your Honor, I don't believe that his counsel, the sentencing did that. I don't think they found one substantial. So I believe that the government indicated that they had one substantial similar cases. What we looked at, Your Honor, what they looked at, Your Honor, was engaging in that. I'm sorry. I answered your question. No. Thank you. Judge Fuller, any questions? Yeah, I have a couple. Counsel, good afternoon. When you refer to the confidentiality agreement, did the government actually accept Denbo's letter that everything will be confidential? Did they actually accept it ever? I, Your Honor, I think by not objecting to it, they did accept it. I'm sorry, Your Honor. Was there silence as acceptance? I believe so. And Judge Hellestein himself was troubled by that. They implicitly accepted it. They handed it to them. They proceeded. They retired to review it. They came back and they accepted it. What about the lawyer's letter saying we understand that Mr. Khurrani is not a target of investigation and will not be prosecuted? Did they accept that? On the same basis, Your Honor, they did not say he was a target of the investigation. Remember, Your Honor, he had had years of contact with the FBI in which the FBI had never suggested to him that he was under investigation. They wanted him to cooperate in their intelligence activities regarding his belongings. And that's what he met with them on. And that was what his understanding was. And that's what Mr. Denbo said his understanding was when he testified. This was something that, you know, this is not the normal type of interrogation that follows an arrest or follows the agents approaching a subject of an investigation and saying we want to talk to you. This was this was somebody who was engaged in an exchange with the FBI unrelated to his being a subject of an investigation and wanted to continue it and brought in an attorney for the purpose of contacting the Bureau and setting up the meeting. And that's what happened. Thank you. Thank you, Your Honor. Thank you very much. We'll turn to Mr. Bove. Mr. Tamayo has reserved some time. Thank you, Your Honor, and may it please the court. My name is Emil Bove. I represent the government on appeal, and I also represented the government in the proceedings in the district court. I'd like to start off today by addressing the arguments challenging the district court's that statements to the FBI in 2017 were voluntary. And I think really at the heart of this is the unique nature of this case and of this defendant. And we've made this point in our brief, but it bears repeating that this is the first time that a member of Hezbollah's Islamic Jihad organization was prosecuted and convicted in the United States. Why does that in terms of voluntariness? It matters because the level of sophistication that Mr. Karani brought to this entire engagement with the FBI sets him apart from virtually any defendant that this court and or others have considered when addressing a voluntariness question. Judge Hallerstein made a specific finding that Karani was sophisticated. And I think that in some the personal characteristics of Karani that are relevant to the analysis here. It's not just that he has a biomedical engineering degree and an MBA. This is a man who was trained by Hezbollah in counter-interrogation tactics. This is the equivalent of the FBI agent sitting down and conducting an interview of a CIA operative. That's an analogy that Karani himself drew. And so I think that the first crucial part of the district court's voluntariness finding relates to his sophistication. And today in the briefing, there were some arguments made about whether Karani understood his target status relative to the FBI's investigation. And I think that the record demonstrates that he surely did. Judge Hallerstein found it at page 664. And excuse the double negative. The agent's quote, never told Mr. Dembo or his client that Karani was not the target of the FBI's investigation. To the contrary, when Karani put in an affidavit in support of his motion to suppress, he acknowledged that the FBI had taken the position with witnesses in the case that Karani was quote, a dangerous man and a terrorist. Based in part on that, Judge Hallerstein found that Mr. Dembo knew that Karani was a member of Hezbollah, a terrorist organization, before the meetings began. That's at page 664 of the appendix. And I think another critical part of the analysis for this issue of whether Karani understood his target status, Mr. Dembo actually told the agent in the same call that raises this confidentiality discussion, told the agent that he didn't think Karani cared if he was at a target. And the testimony at the hearing on that point is at pages 313 and 422 through 23 of the appendix. So that, from the starting point, is Ali Karani, the man, the declarant in these interviews, a sophisticated, trained terrorist operative. And Judge Hallerstein properly found that Karani was strategic, and he behaved strategically in this process. It's the opposite of involuntariness. He sought this out. And it's a point that was made today and acknowledged by opposing counsel. And it's another critical point, underscoring the appropriateness of Judge Hallerstein's finding. There's some factors here that are more common and have come up in other cases. The defendant had experience interacting with law enforcement, not only the FBI, but also in connection with the 2013 arrest by the NYPD. He engaged an experienced attorney to contact the FBI to set these interviews up. Karani deployed Mark Dembo in furtherance of this effort to get in front of the FBI to try and extract some benefits in a strategic way that was entirely voluntary. It was what he wanted to do. And as another example that I think illustrates both the sophistication of this defendant and the voluntariness of what he was doing, the intent of what he was doing, in the September 5th interview, and the testimony about this is at page 441 of the appendix, in the September 5th interview, which is the third of the five where Karani made these admissions, he actually took over the control of who was going to be participating and said, Special Agent Costello, please leave. Mr. Dembo, please leave. I'm only going to talk to Special Agent Shannon. And not only did he set the room in that way, the participants, he also controlled right down to where he was sitting relative to Special Agent Shannon in an effort to exert control over the process. And so those are some illustrations in the record that support Judge Hellerstein's finding that this was not just voluntary, but strategic. So that's Ali Karani and Mark Dembo in this process. What about the agents? Judge Hellerstein found that the agents never offered immunity. And both Mark Dembo and Ali Karani knew that they lacked the authority, the agents lacked the authority to offer immunity. That's at page 665. So then I think against that backdrop, that Judge Hellerstein addressed the arguments regarding the discussion of confidentiality in the document that Judge Fuller referenced a little bit earlier. So what of confidentiality? Judge Hellerstein found that the discussion that Mark Dembo had with the agents was not intended as an offer of immunity or non-prosecution, nor was it understood as such by Karani or by his lawyers. And that's at page 651 in the appendix. And it's a very important finding. Not only did Judge Hellerstein find that objectively the confidentiality discussion was not about immunity, he further found based on a hearing that lasted four days that he presided over, he listened to the testimony of the agents, Karani and Dembo. He found that Mr. Karani and Mr. Dembo didn't view the confidentiality discussion in the way that they were asserting in the motion to suppress. What was the record in support of that finding by Judge Hellerstein? Well, first, during the interviews, the agents admonished Karani that lying during the interviews was a crime for immunity. The agents were saying to Karani during this process, we can use your statements to prosecute you for a false statements crime, for a violation of section 1001. And although that's not the crime that Karani was ultimately charged with, it's certainly made clear that from the agent's perspective, anything that they had said about confidentiality did not preclude for the U.S. Attorney's Office from proceeding with criminal charges. And as Judge Hellerstein found, it also made those points clear to the defendant. The agents also told the defendant that in order to pursue the benefits, the immigration benefits that Karani was seeking, they would have to share the information that Karani was providing with other parts of the U.S. government and potentially the Canadian authorities. And this discussion is at page 661 in the appendix. Those are Judge Hellerstein's findings, including in footnote 5. And so this is another way in which the agents illustrated their understanding and conveyed to Karani that anything that they had said about confidentiality was not an, certainly not a promise of immunity and would not restrict their ability to use the statements in certain ways. Karani himself also manifested his understanding of this during the interview process. At one point, when asked about the 2009 trip to China, he said that there was some information that he was, quote, too scared to share. That's at page 439 in the appendix. And so that's a place where Karani is acknowledging to the agents, I don't trust this confidentiality. Anything that's been said about confidentiality, he is in effect saying, I don't trust that either, that this is going to be something that's a buy-to-buy. And there are some things that I've done for Hezbollah that are so sensitive that I'm not comfortable divulging them to you, Special Agent Shannon and Special Agent Costello, notwithstanding whatever has been said to Mr. Denbo about confidentiality. Another way in which Karani made clear that confidentiality was not important to him and not a fundamental part of the negotiations between the agents and Mark Denbo is that in May 2017, excuse me, 2017, after the interview process concluded, Mr. Denbo, on behalf of Karani, threatened to go to the media to describe the situation, the complete opposite of confidentiality. And as a similar example, when the FBI arrested Karani, they found a set of notes in his apartment. They are included in the appendix at page 649. And one, there's a reference in the quote. And so it's another way in which Karani demonstrated and the record demonstrated that whatever was said about confidentiality between Mark Denbo and the FBI agents prior to these interviews, it was not something that Karani believed conferred immunity on him. And as Judge Hellestein put it, confidentiality in this context had a more restricted meaning than Karani now advances. That's 661 of the appendix again at footnote five. So that was the first argument presented and appropriately rejected by the district court. The second related to the set of notes that Mark Denbo handed to the agents during the April 3rd interview. I think I'll start off with one important point about those notes. They don't reference confidentiality to the extent confidentiality was the linchpin of the negotiations between Denbo and the agents. He did not memorialize in his documents that he testified that for at least his understanding. It's also important to keep in mind that this was April 3rd was the second interview. And so at that point Karani had participated in a prior interview on March 23rd and he had incriminated himself during that interview. He had admitted that he was a member of Hezbollah's Islamic Jihad organization and that he had obtained military training from the IJL. You have a minute left. From the IJL. Thank you. And those findings by Judge Hellestein are at page 664. And so in that context where the document doesn't mention confidentiality he had already incriminated himself at the first interview. As Judge Pooler pointed out the agents did not adopt that document. They simply handed it back and proceeded with the interview. All of those facts support Judge Hellestein's findings that this was another part of the strategic ploy played out by Karani through Mr. Denbo. And here Judge Hellestein found that the intended to bootstrap some legal protections that they had not negotiated and that the FBI did not grant. And he referred to and Judge Hellestein found that Mr. Denbo was a skilled lawyer seeking to quote color the event. But those findings by Judge Hellestein are well supported through the testimony of the hearing that he presided over. And in this context with a operative seeking out interviews with the FBI the district court did not err in finding that the statements were voluntary. With that I will rest on my brief for the remainder of the argument and obviously address questions in the court. Thank you very much. Judge Kearse any questions? No questions. Thank you. Judge Pooler. Yes I have a couple of questions. Thank you. Mr. Beaudet you talked about how Mr. Karani arranged the meeting where he would sit where other people would be. What is the significance of that? From my perspective your honor and I think from Judge Hellerstein as well it illustrates the extent of the control that Karani perceived himself to have over this process and that he sought to exert over this process. And when the district court was addressing a question of whether these statements were voluntary the fact that the defendant perceived himself as having so much control that he could select who was in the room and where they sat were facts that supported the court's finding that the defendant was in that room voluntarily. He was speaking voluntarily and he was there because he wanted to be there. Thank you. I have another question. Was there any direct harm to any person or government that you could trace to Mr. Karani's behavior and action? Was anyone hurt? No one was hurt your honor. And this is at bottom a counterintelligence case and Judge Hellerstein made a finding at sentencing that it was not a victimless crime. And the challenge in the the tracing of the harms caused by Mr. Karani lies in the nature of the crimes that he committed as a sleeper cell operative for the IJO. But who was the victim? Who was the potential victim? And are you telling me there was no actual victim of this crime that Mr. Karani is going to serve 40 years? No your honor I'm not. I believe that there are people who use the buildings that Mr. Karani surveilled to help plan attacks that Hezbollah could execute at the direction of its own leadership or functioning as a proxy for the Iranian government when either of those leadership structures if and when they decide that it makes sense in their calculus to conduct an attack on U.S. soil. But counsel why isn't that victimhood speculative? It's not speculative your honor because the defendant was actually surveilling these premises in a coordinated and strategic way. So for example I'm sitting in my office right now looking at 26 Federal Plaza out the window. That's one of the facilities that Mr. Karani surveilled knowing from his handler that Hezbollah wanted that intelligence so that they could plan an attack there effectively should they elect to do so. Counsel nothing came of this surveillance and furthermore Mr. Karani argues that he left his position as a spy for Hezbollah two years before he made any conversations with the FBI. Is that correct? And what was the danger if he left the organization? So your honor on the first point about nothing has transpired yet I can't dispute that but that is not the sort of the core question of the way Hezbollah's IJL operates. Mr. Karani was providing information to Hezbollah as part of a mosaic used in attack planning where every puzzle piece matters. Things as simple and straightforward to perhaps a pedestrian about where security personnel stage themselves at buildings how people enter and exit or as simple as the uniforms that people wear and every piece of that information if collected in a concerted effort by multiple operatives. So that's a big if if connected by someone but no one connected the dots and no one nothing happened. Nothing happened yet judge nothing happened yet and it's a it's a big if but the results of that if are enormous and extremely tragic particularly with respect to the facilities that the defendant targeted. The 26 Federal Plaza is one of the largest federal facilities in the country but in addition to that he was targeting critical infrastructure at armories in the city where the National Guard would deploy from in the event of a terrorist attack or in the event of a natural disaster. So in other words the defendant was part of attack planning for facilities where you could neutralize the the response of the city state and federal government if if the city is attacked or if the city does experience some kind of disaster. And so I I can't dispute that there is a level of of math and and and probabilities that we're part of the the the calculus that the district court had to do at sentencing but it's important to keep in mind that however remote these things seem we're we're talking about attacks on very very important places in the city that could have just catastrophic consequences. And and that was one of the things that the district court considered at sentencing but it certainly wasn't the the only thing as there were I think important general deterrence points to be made and that were made at sentencing about the need to send a message to Hezbollah and the IJL that because it's exceedingly difficult to capture and detect sleeper cell operatives in the nature of Mr. Karani and so it's very important in a case like this from a general deterrence perspective that a message be sent that if if the FBI is able to apprehend an intelligence operative like Mr. Karani and if they apprehend him or did he come to you? He it was a mixed judge ultimately the FBI arrested him in his department excuse me apartment as he threatened to either flee to the Midwest or flee back to Lebanon. Oh thank you this is very hard because without anyone being harmed any buildings being touched this man is going to spend the rest of his life in prison and that's a hard choice. I think it was a hard choice and it was a choice that the district court took very seriously and certainly the guidelines are not the be-all-end-all in a situation like this but I think that in terms of the reasonableness of a sentence it's important to keep in mind that this was a guideline sentence and there's no challenge on appeal to this to the guidelines. If he had aggregated all the maximas from all the sentences the sentence would have been 110 years rather than 40 years isn't that correct? Yes Judge. Thank you. I have no further questions. Thank you. Mr. Tamayo you've got three minutes. Yes Your Honor thank you I have to stop let me start by correcting what I answered before about bringing to the appendix at page 1962 and 1963. His counsel at sentencing listed a number of cases far more severe than the current case in which the maximum sentence anybody received was 15 years. In one case Your Honor there was a defendant was a member of El Shalab he provided material support to the terrorist organization received 115 month sentence for providing money to the group and for buying machine guns and grenades. He actually went to Somalia to fight and he got 111 months. In another case cited on those pages the defendant joined ISIS and wanted to kill President Obama and scheme to bomb Coney Island. He traveled to Syria to fight for ISIS and in it was a specific plan to bomb a location in New York. He received 15 years. In another case the defendant provided material support for to Al Qaeda including $67,000 and surveilled potential targets in New York. He received 15 years. In another case a defendant counsel is your argument that this sentence is shockingly high because it seems to me Judge Hallerstein impeccably followed the guidelines. But the guidelines Your Honor were based upon that finding that because he was engaged in terrorist activity he was in criminal history six and that projected him far above what he would have received if he had not been at that level. I'm sorry I'm sorry there wasn't a convicted of being involved in terrorist activities. Didn't the category six follow naturally? Yes Your Honor but that's why we believe that the court should have considered the disparity in the sentences. That's that's a consideration under section 3553A. In addition to the guidelines the guidelines aren't controlling and in this case it was substantially higher. In addition Your Honor as we argue in our brief the district courts could have considered the ineffective assistance he received from Mr. Dembele in considering his sentence he was to receive. He is receiving a sentence almost three times longer than people who engage in similar activities including a defendant who provided assistance to Hezbollah including providing guns ammunition and ballproof vests and nightgoggles. He offered to provide those to an informant and he received 15 years. Your Honor one other quick comment the question about how they met and how he met separately with the agent as we discussed in the brief. This was something that had been he had experienced in prior meetings with the FBI when the FBI agent suggested to him that they meet one-on-one without the other agents and the idea that one-on-one they could have a direct discussion. He as Mr. Karani testified he did not like agent Costello. He had met agent Costello in Beirut when he was desperate to get out of the country and Mr. Costello was holding him up from getting out of the country for weeks causing him to lose a job and to have other problems and he felt he had more affinity with agent Shannon and he wanted to meet directly with her. He wanted to sit in a way that agent Costello would be comfortable looking in from outside that everything was was proper going on inside the room. It certainly is not indicating that he was part of something improper and that he was showing some unusual control. He did not purchase anything to support the terrorist activities and the so-called surveillance Your Honor as the government points out in its brief what was that surveillance it was going to Google. He Googled the places he didn't walk into 26 Federal Plaza and look at what uniforms people were wearing or where they were standing. He looked at he went to Google and he looked at hardly sophisticated surveillance type that should put this man in prison for so many years. Thank you. Thank you. Thank you. Thank you. Maybe if I can impose on my colleagues if I can hear from Mr. Bove any response to the Mr. Tameo's comparators. Could you focus on that for a moment with respect to the sentence? Yes, Your Honor, and I think in terms of an argument about whether Judge Hellerstein considered the need to avoid anything disparities is clear that he evaluated the cases cited by Karani of sentencing and made findings that he agreed with the government that those defendants were not similarly situated. And I think one of the most common ways in which those cases are distinguishable from this one is that they involve thing investigation. And in this case, Mr. Karani did actually do these things over a long period of time. He joined Hezbollah. He went to the first training in the early 2000s. And then he was recruited to the Islamic Jihad organization in 2008. And then there was a prolonged series of operations happening that he was given in Lebanon and came back to the United States to execute. And it was not limited to Google Earth. He talked about actually conducting video surveillance of one of these armories. And I think at bottom, when the court was considering the idea of whether or not there were victims in these crimes being surveilled in the manner in which they were surveilled, it is a form of victimhood, particularly when given the objectives that Mr. Karani carried out that surveillance with. And I think the other important point for Judge Hellestine, and I think that it's one that is relevant to evaluating whether or not this sentence was reasonable, it's very important that this sentence reflects the seriousness of these crimes and it reflects that the law enforcement and the intelligence communities do not have to wait until a defendant perpetrates a massive attack on one of these facilities before arresting him, incapacitating him through an article three prosecution, and receiving a fair, obtaining a fair within guidelines sentence that speaks to the severity of this and the uniqueness of it and the uniqueness that this threat poses where you have a terrorist organization widely recognized sending sleeper operatives to embed themselves in the U.S. and to both carry out surveillance, but also to be available to be activated for violence, as I said a moment ago, if Iran or if Hezbollah determines that it makes sense in their operational calculus to do so. I think those were the types of threats and harms that Judge Hellestine was considering in crafting a sentence. He crafted one that was within guidelines, understanding that these were things that actually happened. This wasn't inchoate conduct. This was not a thing. These were real harms, and Judge Hellestine issued an appropriate sentence consisting of those facts. Thanks, Mr. Brogan. Mr. Karnani, do you want to take 30 seconds? Your Honor, I just would point out that a lot of what has been said, again, the pictures that were taken were taken from the street. They weren't taken from a secret place. This is something anybody could see, and there was no evidence regarding any of this going back. Thank you very much, Your Honor. Thank you. We'll reserve the decision, and I'll ask the court to adjourn court. Court stands adjourned.